***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby AFFIRMS in part, and REVERSES in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties and submitted to the Deputy Commissioner and in a Pre-trial Agreement admitted into the evidence of record as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer on June 3, 1999.
3. American Interstate Insurance is the carrier on the risk.
4. Plaintiff sustained a compensable injury on June 13, 1999.
5. The following exhibits were stipulated by the parties into the evidence of record through the Pre-Trial Agreement:
a. The Industrial Commission Forms: 18, 19, 22, 24, 33, 33R, 60, and 90.
b. Employee's medical records from Dr. William Oh of Harnett Orthopaedic Specialists beginning with medical note of July 9, 1999.
c. Employee's medical records from Good Hope Hospital beginning with medical note of September 3, 1999.
d. Employee's medical records from Betsy Johnson Memorial Hospital beginning with medical note of October 5, 1999.
e. Employee's medical record from Dr. David Allison dated November 3, 1999.
f. Employee's medical records from Dr. Nailesh Dave of Good Hope Outpatient Neurology Clinic dated January 4, 2000.
g. Employee's medical records from Dr. William Balance of Greenville Pathology dated March 8, 2000.
h. Employee's medical records from Dr. Bradley Broussard of Cape Fear Orthopaedic beginning September 19, 2000.
i. Employee's medical records from Dr. James Shearer of Primary Care Plus dated September 25, 2000.
j. Employee's medical records from Dr. Toni Harris of Eastern Carolina Pain Management Center, beginning November 15, 2000.
k. Employee's medical records from Dr. Toni Harris of Fayetteville Ambulatory Surgery Center dated November 20, 2000.
l. Employee's medical records from CCRC Hope Mills beginning December 1, 2000.
m. Employee's medical records from Lucas Van Tran dated March 16, 2001.
n. Letter from Dr. Mark Brenner of Pinehurst Surgical Clinic dated July 18, 2000.
o. Vocational Rehabilitation Reports dated August 10, 2001 through November 14, 2003.
p. Defendants' First Set of Interrogatories and Request for Production of Documents.
6. The parties contend the issues to be determined by the Commission are whether the position as appointment setter was suitable employment for plaintiff; what was plaintiff's correct average weekly wage; are defendants due a credit for overpayment of temporary total disability benefits; has plaintiff cooperated with vocational rehabilitation efforts offered by defendants and, if not, should her benefits by suspended; did plaintiff unjustifiably refuse suitable employment and, if so, should her benefits be terminated.
 ***********
Based upon the evidence of record and any reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff suffered an injury by accident to her left elbow when her truck door closed on her elbow on June 13, 1999. At the time of the injury, plaintiff was employed with defendants under a lease agreement as an owner-operator of a truck, hauling mobile homes.
2. Following her injury, plaintiff continued to work driving her truck for approximately two months until August 20, 1999. Thereafter, defendants accepted plaintiff's injury as compensable on a Form 60 and began payment of temporary total disability compensation on September 14, 1999 with a date of disability of August 20, 1999.
3. Temporary total disability benefits paid pursuant to the Form 60 were based on an average weekly wage of $942.88 and a weekly compensation rate of $560.00. However, defendants miscalculated plaintiff's average weekly wage for the 52 weeks prior to the date of injury by dividing the gross total of the amounts paid to plaintiff by 52 weeks. Defendants did not take into account or deduct the expenses incurred in generating plaintiff's gross income when calculating her average weekly wage.
4. Plaintiff received money for a fuel surcharge (FSC), the use of beacon lights, reimbursement for the costs of "escorts," changing flat tires on a mobile home while transporting it and for miscellaneous expenses such as tolls and fax charges. Deductions were made from plaintiff's gross income for advances for part of the pay for the load used for fuel, an escrow account that provided for damages incurred, and an escrow account that deducted for physical damage insurance and for workers' compensation insurance.
5. These expense amounts that were not taken into consideration by defendants in calculating plaintiff's average weekly wage are not indicative of wages earned by plaintiff and do not yield an amount that would most nearly approximate what plaintiff would have earned but for her injury.
6. In 1998, after taking into account expenses incurred and deductions, plaintiff earned $23,714.48. In 1999, after taking into account expenses incurred and deductions, plaintiff earned $6,814.75. Therefore, the total amount earned for the 52 weeks prior to plaintiff's accident is $30,529.23. Plaintiff's correct average weekly wage is $587.10, yielding a weekly compensation rate of $391.42.
7. The Full Commission finds that as a result of defendants' miscalculation, plaintiff received an overpayment of temporary total disability payments.
8. Following her injury, plaintiff was treated by Dr. William Y. Oh, an orthopaedic surgeon, who diagnosed plaintiff with lateral epicondylitis of her left elbow. On September 21, 1999, Dr. Oh indicated that plaintiff's pain appeared to be out of proportion to her injury, with few objective signs to support plaintiff's complaints.
9. Thereafter, Dr. Oh recommended nerve conduction studies, which were abnormal revealing a cervical radiculopathy at the C5 level. Therefore, a cervical MRI was recommended to further assess plaintiff's condition. While the MRI revealed some abnormal findings, Dr. Oh did not believe that it explained plaintiff's unusual complaints of left elbow pain.
10. On November 5, 1999, Dr. Oh encouraged plaintiff to return to work on November 12, 1999. However, plaintiff did not return to work and instead requested and received from defendants' approval for a visit with a neurologist.
11. Plaintiff returned to Dr. Oh on November 29, 2000 and continued to complain of elbow pain. According to Dr. Oh, plaintiff was capable of working and he believed that she had other reasons besides her elbow condition for not returning to work. Dr. Oh felt that an appointment with a neurologist was not medically necessary and that plaintiff was not experiencing any neurological problems.
12. Plaintiff was examined by neurologist Dr. Nailesh D. Dave on January 1, 2000, who found no objective neurological findings but rather subjective paresthesias of plaintiff's left upper extremity. Dr. Dave felt that plaintiff was able to work but that, due to her description of her job and her subjective complaints, she could not return to work as a truck driver unless her symptoms resolved in the future.
13. Dr. Oh continued to treat plaintiff and offered surgery as an option. On February 17, 2000, plaintiff decided to undergo surgery for her left lateral epicondylitis, which was performed on March 8, 2000 by Dr. Oh.
14. Thereafter, plaintiff underwent physical therapy and, on April 20, 2000, plaintiff was again examined by Dr. Oh. Plaintiff complained that her pain was not improved by surgery or therapy.
15. Dr. Oh found that plaintiff had reached maximum medical improvement on April 20, 2000.
16. On July 18, 2000, Dr. Mark E. Brenner of Pinehurst Surgical Clinic evaluated plaintiff. Dr. Brenner found plaintiff's elbow had a full range of motion and some numbness near the surgical scar. Dr. Brenner was hopeful that plaintiff could return to work in her previous capacity as a truck driver within two to three months and that plaintiff's period of disability should end within eight to ten more weeks. Further, Dr. Brenner felt that plaintiff's injury should not be career ending. Dr. Brenner assigned plaintiff a 7% impairment rating of her left arm.
17. On September 19, 2000, plaintiff began treating with Dr. Bradley J. Broussard of the Cape Fear Orthopaedic Clinic in Fayetteville, North Carolina. Plaintiff reported experiencing extreme pain from her shoulder to her wrist and was very sensitive to light palpation. Dr. Broussard found plaintiff's pain out of proportion to her injury and obtained x-rays, which revealed no acute abnormality and no arthritis. Dr. Broussard was concerned with possible mild reflex sympathetic dystrophy (RSD) and recommended a bone scan. Dr. Broussard found, from an orthopaedic standpoint, that plaintiff had reached maximum medical improvement with a 10% impairment of her left upper extremity. Dr. Broussard strongly recommended vocational rehabilitation.
18. On October 10, 2000, plaintiff returned to Dr. Broussard at which time he indicated that the bone scan did not reveal an increased up-take consistent with RSD. Nevertheless, Dr. Broussard was concerned with early RSD and referred plaintiff to Dr. Toni Harris for pain management.
19. On November 15, 2000, plaintiff began treating with Dr. Harris. Dr. Harris also recommended that plaintiff participate in vocational rehabilitation
20. Vocational rehabilitation was initiated with a vocational assessment by plaintiff's case manger Lew Drumm during the summer of 2001.
21. Thereafter, on October 5, 2000, Mr. Drumm noted that plaintiff had enrolled in a keyboarding class, which might lead to employment since plaintiff had previously used keyboard skills in earlier employment. On October 16, 2001, plaintiff notified Mr. Drumm that she had not completed the keyboarding class due to pain, and Mr. Drumm acknowledged he had observed increased difficulty with plaintiff's pain. On October 29, 2001, plaintiff and Mr. Drumm agreed that plaintiff would apply in person to five employers.
22. On November 15, 2001, plaintiff and her attorney met with Mr. Drumm. Plaintiff expressed an interest in seeking employment preparing tax returns. Plaintiff brought the name and number for the keyboard class teacher and Mr. Drumm declined to take it. Mr. Drumm set up an interview with Protect America. Mr. Drumm made plans to accompany plaintiff to her next appointment with Dr. Broussard on November 29, 2001.
23. On November 20, 2001, plaintiff went to an interview with Protect America but plaintiff could not be interviewed because she was dressed in jeans. Another interview was set up for November 29, 2001.
24. On November 29, 2001, plaintiff attended a job interview with Teresa Jackson of Protect America during which a thorough explanation was made of the job duties of appointment setter. According to plaintiff, she had experience in this type of work from past employment in telemarketing.
25. On December 10, 2001, Ms. Jackson offered plaintiff the job of appointment setter at Protect America. The job was a telephone solicitor working 30-32 hours a week at the second shift hourly wage of $7.50 plus $10.00 commission on every sale and $25.00 bonus for seven sales in one week or a $50.00 bonus for ten sales in one week per the written job description provided by Ms. Jackson, although her letter indicated a salary of $7.00 per hour.
26. Shortly thereafter, on December 12, 2001, Dr. Broussard reviewed and approved the job description form submitted to him by Ms. Jackson.
27. Plaintiff attended a training session with Protect America on December 27, 2001 but did not complete the class. The trainer asked plaintiff to put more enthusiasm into the reading of a script; however, plaintiff indicated that she was not enthusiastic about the script and thereafter left at a break and did not return. As a result, defendants filed a Form 24 application to terminate benefits which was denied by the Executive Secretary's Office. Plaintiff was not ordered by the Executive Secretary to comply with vocational rehabilitation efforts.
28. Plaintiff's counsel sent a letter to Mr. Drumm including plaintiff's version of the training session and requesting a meeting with Mr. Drumm.
29. No additional vocational rehabilitation occurred until April 8, 2002 when a new case manager, Ernest Jones, was assigned to plaintiff. When Mr. Jones contacted plaintiff's counsel on April 8, 2002, he learned plaintiff had filed a Motion to Cease Rehabilitation Efforts which was denied by the Commission.
30. On April 22, 2003, Mr. Jones met with plaintiff to continue her job search. Plaintiff had contacted numerous employers on her own. Mr. Jones talked to plaintiff about a position at Subway.
31. On May 23, 2002, Mr. Jones met with plaintiff and her attorney. Her attorney indicated that since plaintiff had been making $48,000.00 at the time of her injury, plaintiff would not apply for jobs that paid less than $15.00 to $20.00 per hour. Plaintiff's counsel asked for retraining for plaintiff and those present discussed the geographic limitations of positions for plaintiff.
32. On June 15, 2002, plaintiff again met with Mr. Jones. They discussed only one position as a small engine mechanic, which paid wages comparable to plaintiff's pre-injury wages. Plaintiff expressed interest in the position.
33. On August 13, 2003, Mr. Jones provided a list of positions and plaintiff registered with a job service in Dunn, North Carolina. Mr. Jones informed plaintiff about caseworker positions with the Department of Social Services, administrative assistant, sewing machine operator, office assistant and dispatcher.
34. Plaintiff met with Mr. Jones August 27, 2003 and Mr. Jones continued to present a wide variety of positions from security guard to cashiers. Mr. Jones did not indicate salary ranges and the job duties of some of the positions were outside plaintiff's restrictions.
35. On September 10, 2003, plaintiff and Mr. Jones met. Plaintiff indicated she had followed up on or applied for many of the positions provided to her by Mr. Jones. Plaintiff indicated a willingness to continue to cooperate with vocational rehabilitation efforts.
36. Plaintiff and Mr. Jones met on September 23, 2003 and September 30, 2003. Mr. Jones continued to provide a list of open jobs. Many of the positions provided were not representative of plaintiff's skills and experience.
37. On October 6, 2003 and October 15, 2003 when plaintiff and Mr. Jones met, Mr. Jones was unhappy that plaintiff was not contacting every job lead he provided. On October 6, 2003, plaintiff was given job leads of sewing machine operator, clerical position, and appointment setter. On October 15, 2003, Mr. Jones provided a seamstress position, a security officer, and a clerk at a convenience store.
38. On October 27, 2003, plaintiff had applied for positions on her own, as well as contacted leads Mr. Jones had provided her.
39. Plaintiff had vocational rehabilitation meetings with Mr. Jones on November 4, 2003 and November 14, 2003. Mr. Jones continued to provide a list of positions. Plaintiff brought two denial letters showing that she had applied for positions provided by Mr. Jones and been rejected because she did not meet the basic job qualifications.
40. The Full Commission finds based upon the greater weight of the credible evidence that plaintiff has complied with reasonable vocational efforts. Plaintiff has continued over a two-year period to have regular meetings with her case manager and has actively sought employment. Plaintiff's failure to pursue positions which were not suitable to her skills, education or experience does not reflect an unwillingness to participate in the vocational rehabilitation process.
41. The Full Commission finds that although defendants overpaid plaintiff, plaintiff justifiedly relied upon her average weekly wage as miscalculated by defendants. In its discretion the Full Commission finds defendants are not entitled to a credit for overpayment which was due to defendants' mistaken calculations and which defendants did not request for almost three years.
42. The Full Commission finds that plaintiff was justified in declining the position of appointment setter with Protect America, as it did not represent suitable employment because it offered significantly lower wages that plaintiff reasonably believed to be her pre-injury wages. Based upon defendants' miscalculation of her average weekly wage, plaintiff believed that her pre-injury annual wage was $48,000.00, while the correct wage was actually $30,529.23. Therefore, plaintiff had an unrealistic expectation of what she should earn at subsequent jobs and refused to consider some job opportunities that may actually have been suitable from a wage-earning standpoint.
 ***********
Based upon the above stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On June 13, 1999, plaintiff suffered an injury by accident arising out of and in the course of her employment with defendants. N.C. Gen. Stat. § 97-2(6). As the result of this compensable injury by accident, plaintiff was disabled and is entitled to payment of temporary total disability compensation pursuant to the Form 60 filed with the Commission. N.C. Gen. Stat. § 97-29.
2. Defendants are entitled to have plaintiff's average weekly wage amount corrected. The average weekly wage shown on the Form 60 did not constitute an enforceable agreement but was provided "for informational purposes only" as clearly stated on the form. On June 13, 1999, plaintiff's correct average weekly wage was $587.10 per week, yielding a weekly compensation rate of $391.42. N.C. Gen. Stat. § 97-2(5). The mistake in calculating plaintiff's average weekly wage was due to defendant' miscalculation. While plaintiff has been enriched because of defendants' mistake, it would be unfair to deduct from plaintiff's future compensation for a past mistake plaintiff did not make and upon which she has justifiably relied. Therefore, future payments of compensation shall reflect the correct average weekly wage from the date of the Opinion and Award of the Deputy Commissioner, but no credit shall be given defendants for past overpayments. N.C. Gen. Stat. § 97-42.
3. Plaintiff was justified in refusing the position as appointment setter with Protect America which was not suitable employment. N.C. Gen. Stat. § 97-32. The suitability of a position is not limited to consideration of physical limitations, but also includes the similarity of wages offered and the possibilities for advancement. Dix v. City ofDurham, 128 N.C. App. 501, 495 S.E.2d 380 (1998). Although the job may have actually offered wages similar to plaintiff's pre-injury wages, plaintiff was under a misapprehension of the amount of wages she earned due to defendants' mistaken calculation of her average weekly wage. Plaintiff reasonably relied on that miscalculation and was justified in refusing this employment based upon her knowledge of her wages at that time.
4. Plaintiff shall continue to comply with reasonable vocational efforts offered by defendants. N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Beginning March 31, 2004, defendant shall continue to pay plaintiff temporary total disability compensation at a weekly compensation rate of $391.42 based upon an average weekly wage of $587.10 until plaintiff returns to work or further Order of the Commission. 2. Plaintiff shall continue to cooperate with all future reasonable vocational efforts.
3. Defendants shall pay the costs due the Commission and Dr. Broussard's expert witness fee, if not already paid.
This the 2nd day of November 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/kjd